IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 05-407 (JBS) |
| ROBERT G. PELLE, | **OPINION** |
| Defendant. | |

APPEARANCES:

Christopher J. Christie
United States Attorney
     By:  Philip James Degnan
          Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
970 Broad Street
Room 700
Newark, NJ 07102
     Attorney for the United States of America

Robert N. Agre, Esq.
LAW OFFICES OF ROBERT N. AGRE
4 Kings Highway East
Haddonfield, NJ 08033
     Attorney for Defendant Robert G. Pelle

**SIMANDLE**, U.S. District Judge:

On March 23, 2004, Defendant Robert Pelle consented to a search of his computer hard drive in connection with an investigation into his alleged involvement with an organization and web site called "BoyLoversUnited."  In September, 2004, agents from the Department of Homeland Security, Immigration and Customs Enforcement conducted the search of Pelle's computer which revealed child pornographic images.  That same month, several law enforcement officers arrived at Pelle's home to

question him.  At the close of the interview, Defendant was asked

by Investigator Amy Jewusiak how he was treated by the officers

who conducted the interview. Defendant replied that he was not

threatened, and that the officers were "very cordial, very nice."

Defendant now argues, however, that the officers actually

threatened him during the interview, and that they repeatedly

declined his requests for counsel.  Defendant has thus moved to

suppress statements made during that interview.  For reasons

explained in this Opinion, the Court will credit Defendant's

earlier, contemporaneous version of the events.  The Court also

finds that Defendant's Fifth Amendment rights were voluntarily

waived, and were not otherwise violated.  Accordingly, the

instant motion will be denied.

## I.  BACKGROUND

On March 23, 2004, members of the Camden County Prosecutor's

Office met with Defendant Robert G. Pelle to investigate his

alleged involvement with "BoyLoversUnited."  At that meeting,

Defendant executed consent to search forms for his home and

computer hard drive, and his computer was seized.  The next day,

Investigator Jewusiak contacted Pelle and informed him that the

internal policy of the New Jersey State Police required his

presence during the search.  Pelle responded that he would first

contact his attorney and then "get back to her."  By March 26,

2004, Defendant had not contacted Jewusiak.  Jewusiak again

2

contacted Pelle and, for the second time, Pelle told her that he would contact his attorney and make the appropriate arrangements. No lawyer contacted Jewusiak, though, and whatever qualms she had about the prospect of Pelle or his lawyer withdrawing consent or demanding the return of his computer dissipated over time when Pelle took no such action.

Accordingly, in September, 2004, after not hearing from Pelle or any lawyer for months, the Camden County Prosecutor's Office enlisted the aid of the federal customs authorities, who did not require Pelle's presence for the search.  The search of Pelle's computer hard drive was conducted by agents from the Department of Homeland Security, Immigration and Customs Enforcement, who then seized evidence related to the charged crimes.[1]

Later that month, on September 20th, four law enforcement officers, including Jewusiak, arrived unannounced at Pelle's home, after meeting each other in the vicinity.  The other officers were Agent Lisa Franchini, also of the Camden County Prosecutor's Office, Agent Matthew Brodman of the Department of Treasury, United States Customs Service, and Jim Lynch.  At the time, Lynch was employed by the County of Essex County Sheriff's

---

[1] Defendant Pelle's previous motion to suppress evidence gathered from the search of his computer hard drive was denied in this Court's Opinion and Order, United States v. Pelle, Cr. No. 05-407 (D.N.J. filed Feb. 17, 2006) (JBS).

Office, but had been assigned to the Pelle Investigation by the
U.S. Customs Task Force.[2]

Pelle claims he returned home from work that day at about
3:20 P.M., and went to the backyard to perform some maintenance
on the pool "skimmer."  (Tr.A[3] at 123:22-124:3.)  By the time he
returned to the front yard, the four officers had arrived at his
house.  (Id. at 124:4-11.)  Pelle permitted them entry and was
initially told to "secure" his dog in a safe place.[4]  (Id. at
125:1-17.)  Pelle then brought the dog to the backyard, and came
back inside.

When he returned, Pelle observed Matt Brodman conducting a
protective sweep of the upstairs.  (Id. at 125:17-22.)  Brodman
then returned to the foyer, at which point Jewusiak immediately
began advising Pelle of his Miranda rights.  (Id. at 126:1-15;
127:15-18.)  The officers explained that they were reading Pelle
his rights because they had found child pornographic images on

---

[2] For the past roughly seven years, Lynch has been assigned to the U.S. Customs Task Force while employed by the County of Essex County Sheriff's Office.

[3] "Tr.A" refers to the hearing transcript of May 17, 2006, while "Tr.B" will refer to the hearing transcript of May 22, 2006.

[4] Pelle argues that the officers followed him uninvited into his home.  Pelle does not contend that the officers either forced themselves into the home, or that he asked them at that point to leave.

his computer.[5]   (Id. at 127:19-128:2.)   After Pelle was read his rights he was presented with a waiver of rights form.   (Id. at 128:9-18.)

At that point, Pelle, who was now sitting on the living room sofa, went to answer the phone which had been "ringing off the hook."  (Tr.B at 20-21.)   According to Defendant, though, Lynch requested that he not answer the phone, instead asking him again to sign the form.   Pelle maintains that he then said: "I don't want to sign anything right now.   I think you people should leave until I consult with my attorney."  (Tr.A at 129:6-8.)   Lynch then responded, according to Defendant's version of the events, by threatening to return at 5:00 the next morning with three warrants, one for him, his wife, and mother, and bring them all in for questioning.   (Id. at 129:10-14.)   Lynch denies making that statement.

Shortly thereafter, at 3:55 P.M., Pelle executed a Miranda waiver of rights form (Ex. S-4) and the officers proceeded to question him.   At approximately 4:55 P.M., Lynch switched the focus of the questioning from the images allegedly found on Pelle's computer to Defendant's relationship with his adopted

_____

    [5] As already noted, the search which yielded these images was conducted pursuant to Pelle's validly obtained consent.   (See 2/17/06 Slip Op.)

son.[6]  According to Pelle, once Lynch intimated that he and
Brandon were having improper relations, Pelle "started getting
vocal." (Id. at 133:10.)  Pelle then raised his hands and said
in a loud tone, "Jim, I don't know what you're talking about."
(Id. at 133:9-19.)  Lynch then asked Pelle to "please put [his]
hands down," which Defendant did. (Id. at 133:18-25.)

    Between approximately 4:45 and 5:00 P.M., Defendant's
adopted son, wife, and mother all arrived home separately.[7]
According to the testimony of the three family members, Brodman
was waiting outside when Anna Pelle (Defendant's wife) and
Delores Pelle (Defendant's mother) arrived home.  Anna arrived
first, at approximately 4:45 P.M., and went inside to use the
bathroom.[8]  While inside, she saw Defendant seated on the
livingroom couch with Lynch and Jewusiak.  She claims that
Brodman then told her to leave the house, which she did.  She
then proceeded to her neighbor's house to place several phone

---

    [6] For the first hour of questioning, Defendant claims, none
of the officers raised his/her voice.  (Tr.A at 131:12-18.)

    [7] Brandon claims he was at his friend's house next door at
about 3:20 when he first noticed his father's car in the
driveway.  He then attempted to telephone his father, but no one
answered after five or six rings.  Brandon then returned home a
little after 4:00 P.M., and, upon his arrival, Defendant told him
to go downstairs to watch television.  Instead, Brandon went back
to his friend's house, where he stayed until approximately 4:45.

    [8] Anna also testified that while inside she noticed that the
kitchen wall-phone had been removed from the wall and placed on
the table.  (Tr.A at 69:7-70:3.)

calls, including one to her friend, Tina Terregino.  Ms. Pelle
did not herself try to call home.

Delores arrived home soon after Anna.  According to the
testimony of Anna and Delores, which was corroborated by Brandon,
Brodman told Delores that she was not permitted to enter the
home, and physically restrained her when she attempted to do so.
(Id. at 54:9-20; 56:4-8; 68:24-25; 70:21-25; 106:13-107:2.)

Meanwhile, the phone inside began to "ring[] off the hook."
(Id. at 134:3-4.)  But, Defendant maintains, the officers asked
him not to answer it.  Instead, after asking Pelle to lower the
volume of the ring, which Pelle was unable to do, Brodman
allegedly placed the receiver off the hook onto the table.
According to her testimony, Tina Terregino was the caller on the
other end of the line.

Ms. Terregino testified that she was at her home when she
received a phone call from Pelle's wife Anna at approximately
5:00 P.M., informing her that officers were at Pelle's home and
that "something was wrong."  (Id. at 75:10-12.)  She then
immediately proceeded to call Defendant's home and, according to
her testimony, the receiver was picked up but nobody answered.
Ms. Terregino claims that she did not hang up the receiver, but
instead listened to the conversation on the other end of the
line.

Defendant's adopted son, wife, and mother also testified to hearing the same conversation through an open window as they waited on the front porch.  With remarkable consistency, the three family members and Ms. Terregino repeated essentially verbatim Defendant's account of certain exchanges between Pelle and the officers.  The first allegedly occurred at approximately 5:20 P.M., when Detective Lynch allegedly said, "God damn it, something happened in this house and I'm not leaving until I find out what it is."  (Id. at 57:3-6; 71:14-16; 88:15-19; 109:2-5.) Lynch denies making this statement.[9]

Next, according to Defendant and the other defense witnesses, Detective Lynch threatened to arrest Pelle's mother, stating: "How old is your grandmother [sic], 73, 74?  You wouldn't like to see her go out of the house in handcuffs, would you?"  (Id. at 57:10-13.)  According to Defendant, Lynch continued:

> And what about your wife, you and your mother didn't do anything, what about your wife?  Now don't get me wrong, your wife, she seems like a really nice person, but is she slow, is she on medication, how would you feel if I had to take her out in handcuffs and take her out of here for questioning?  But with your wife, maybe her mind would crack, we would have to put her somewhere to get her treatment because she would have some kind of breakdown.  How would you feel about that? And as far as your son, I could put him in foster care faster than you can blink and eye.  I'm going to tell

---

[9] Lynch explained that he would not have used the Lord's name in vain because he is a minister in his church.  (Tr.B at 43:3-7.)

you something, Mr. Pelle, it's not my job to break up
families, but, God damn it, I'll break up this one if I
have to.

(Id. at 135:13-136:1.)

Immediately following Lynch's comments, Pelle testified,

Pelle requested counsel, but the officers denied that request.[10]

(Id. at 109:2-9.)  Specifically, Pelle maintains that he told the

officers that his attorney's phone number was on the refrigerator

and asked if he could get it to call.[11]  Agent Lynch testified

that at no time did Mr. Pelle request counsel.  (Id. at 40:12-

24.)

Subsequently, Ms. Terregino claims she hung up the phone.

The other witnesses testified that they heard no other statements

---

[10] Brandon testified that he heard Lynch threaten to break
up the family, but did not testify to hearing the statement about
Anna Pelle.  (Tr.A at 57:3-58:2.)  Anna and Delores testified to
hearing Defendant request his lawyer after Lynch commented that
he knew "something happened in this house."  (Id. at 71:14-
24;109:2-9.)  Ms. Terregino testified to hearing (through the
open phone line) the threat directed at Pelle's mother, and then
Defendant's request for counsel.  (Id. at 88:15-25.)

[11] Brandon corroborated Defendant's testimony that Pelle
kept the number for his attorney on a piece of paper on the
refrigerator door.  Moreover, according to a supplemental
submission made by Defense counsel, Pelle retained counsel,
Jeffrey Gold, Esq., shortly after his computer was seized on
March 23, 2004, in connection with the DYFS case and the state
criminal matter.  However, according to Mr. Gold, after the DYFS
dismissal Pelle failed to pay certain legal fees, and did not
respond to Mr. Gold's several attempts to ascertain whether Pelle
was going to retain him in connection with the criminal matter.
Because Pelle failed to make the requisite payments or otherwise
respond to Mr. Gold's inquiries, Mr. Gold closed Pelle's file on
August 20, 2004.

for the duration of the questioning, but did hear Defendant sobbing.

At about 5:15 P.M., according to Defendant, the dog, who had been secured upstairs, began making noise.  Pelle testified that he offered to tend to the dog but Matt, who was still inside, threatened with his hand on his gun to go upstairs and "take care of that dog."  (Id. at 136:13-23.)  From that point until approximately 5:50 P.M., Defendant decided to "remain quiet" and "not say anything" to the officers.  (Tr.B at 5:14-21.)  The only officer to talk to Pelle during that 30 minutes of silence was Franchini who, according to Pelle, was only "trying to make some small talk, complementing . . . how nice the house looked, along those lines, trying to make like small talk."  (Id. at 8-13.)

Lynch, meanwhile, was gathering his belongings, having declared the investigation concluded.  Pelle testified that as Lynch was preparing to leave, he threatened to obtain warrants for the other family members.  Lynch denies having made such threats.  Pelle then decided that he would no longer remain silent and, from approximately 6:00 until 6:55 P.M., he proceeded to give a detailed confession related to the charged crimes. Pelle maintains, though, that the stories were all fabricated and that he made then up "to appease" the officers.  (Id. at 7:13-16.)

At about 6:55 P.M., Pelle agreed to give a taped statement.

10

At the beginning of that statement, Pelle was read his Miranda rights for a second time, acknowledged that he understood those rights, and agreed to waive his right to an attorney.  (Ex. S-6.)  As he gave his taped statement, Pelle was in the living room with Amy Jewusiak and Lisa Franchini, and Lynch was standing in the foyer, but had not left the room completely.  (Id. at 8:15.)  Pelle maintains that Lynch was "just staring" at him as he gave his statement.  (Tr. at 8:15-21.)  At the end of the taped statement, the following exchange took place between Jewusiak, who was conducting this portion of the interview, and Pelle:

    Jewusiak: Ok, ok.  Do you have any questions?  Um have
              everything you stated been the truth?

    Pelle:    Yes.

    Jewusiak: Have we threatened you, made any promises to
              you to give this statement?

    Pelle:    No.

    Jewusiak: Ok, basically how have we been to you?

    Pelle:    Very cordial, very nice.

    Jewusiak: Ok we've been, we've been honest with you?

    Pelle:    Yeah.

    Jewusiak: And up front with you right?

    Pelle:    Yes.

(Ex. S-6.)  The statement was concluded at 7:11 P.M.  Pelle was then placed under arrest, handcuffed and escorted outside by

Lynch.[12]

On May 18, 2005, a Newark, New Jersey Grand Jury returned a three-count Indictment against Defendant Pelle charging him with one count of receiving and distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B); one count of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B); and one count of knowingly and willfully transporting a minor in interstate commerce with the intent that the minor engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a) and 2.

Defendant subsequently filed a motion to suppress the information seized from the search of his computer hard drive, which this Court denied by Opinion and Order dated February 17, 2006.  Defendant then filed the instant motion seeking to suppress his oral statements of September 20, 2004, on grounds of involuntariness, and the Court convened a suppression hearing on May 17, 2006, which was continued on May 22, 2006.  Defendant did not raise his additional ground for suppression – that he was denied his right to have counsel present – until the hearing was

---

[12] Pelle testified that his hands were cuffed in front of his body as he left the house.  (Tr.B at 27:2-4.)  Although Pelle admits that Lynch was not rough with him, Pelle claims that Lynch "pushed [him] off of the porch" (id. at 25:23-26:2) "through the rose bushes" (id. at 26:19-20) which caused him to "end[] up on the lawn."  (Id.)  Based on the photo of the house which is in evidence (Ex. P-2) however, that characterization is somewhat misleading, as the "porch" is not raised from the lawn.

convened.   (Tr.A at 9:1-21.)   The parties filed supplemental memoranda, and the Court heard oral argument at a hearing on June 29, 2006.

## III. DISCUSSION

Defendant objects to the introduction of his September 20th confession on two grounds: first, he argues the confession was not given voluntarily but, rather, was the product of coercion; and second, Pelle maintains that his statement was taken in violation of his Fifth Amendment right to counsel because his multiple requests for counsel were denied.   The Court rejects both of Defendant's arguments and will permit the Government to seek to introduce Defendant's confession at trial.

A.   Voluntariness of Confession

In order for the Government to introduce evidence of a custodial confession, it must demonstrate that under the totality of the circumstances, the statement was the "product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).

The involuntariness inquiry ultimately seeks to answer the question whether, under the totality of the circumstances, the defendant's will was overborne when he confessed.   Miller v. Fenton, 796 F.2d 598 (3d Cir. 1986).   A necessary predicate to a finding of involuntariness is coercive police activity, United

13

States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005), citing

Colorado v. Connelly, 479 U.S. 157, 167 (1986), and there must be

some causal connection between the police conduct and the

confession.  Id., citing Connelly at 164.  The burden is on the

Government to establish, by a preponderance of the evidence, that

the challenged statement was voluntary.  Lego v. Twomey, 404 U.S.

477, 489 (1972).  Important considerations also include such

factors as the length of interrogation, its location, its

continuity, the defendant's maturity, education, physical

condition and mental health, and whether police have advised the

defendant of his rights to remain silent and have counsel

present.  Swint, 15 F.3d at 289, quoting Withrow v. Williams, 507

U.S. 680, 693-94 (1993) (internal citations omitted).  The Court

finds that the Government has met its burden here.

     The investigators in this case advised Pelle of his rights

on several occasions during the course of the three hours they

were present.  Pelle knew he was the subject of an investigation

regarding child pornography which he had known about for six

months since the seizure of his computer, and the questioners

employed no trickery or deceit.  Pelle is a mature, articulate

person who was being questioned in his own living room, and he

was in good physical and mental condition at the time of the

questioning.  There was no show of force nor was he treated

disrespectfully, as he acknowledged in his recorded statement.

All of these circumstances suggest that the police did not engage in conduct that overbore Pelle's desire to remain silent and to have his lawyer present.

Defendant's testimony is in direct contrast to his own contemporaneous characterization of the events of September 20, 2004; namely, that the agents were "very cordial" and "very nice" and that they did not threaten him.  His response to the open-ended question was corroborated by the testimony of the participating agents who testified before this Court.  For these reasons, the Court concludes that Defendant's confession was voluntary, and that he was not threatened or otherwise coerced into giving his confession.

As recounted above, at the end of the taped statement, which coincided with the end of the questioning, the following exchange took place:

> Jewusiak: Have we threatened you, made any promises to
>           you to give this statement?
>
> Pelle:    No.
>
> Jewusiak: Ok, basically how have we been to you?
>
> Pelle:    Very cordial, very nice.

Defendant would now have the Court believe that he was directing his answers only to Amy Jewusiak and Lisa Franchini, the two officers who were sitting with him as he gave his statement.  In other words, Defendant maintains that he interpreted the "we" in Jewusiak's questions to refer only to Jewusiak and Franchini.

The Court will not accept Defendant's explanation in light of the
circumstances in which the statement was given.[13]

First, the Court listened to portions of the tape, and
Defendant's voice sounds calm; he does not appear flustered or
nervous, and his tone is conversational, not brooding or morose.
Second, and importantly, Defendant testified that Lynch had not
left the room when Pelle was giving the taped statement; indeed,
Pelle testified that he could see Lynch "staring" at him.
Moreover, Lynch had led the questioning for the several hours
prior.  Thus, it is simply unbelievable that Pelle thought the
"we" in Jewusiak's questioning excluded Lynch who was standing
right there.  His answer referred to the quality of the treatment
by all officers that afternoon, including Lynch.

Moreover, if Lynch did in fact threaten and intimidate Pelle
over the course of the questioning and then continued to stare at
him while he gave the taped statement, Pelle's voice would likely
have sounded uncomfortable or reluctant, at the very least, on
the taped statement, which it did not.  Furthermore, the
testimonies of Investigator Jewusiak and Investigator Lynch were
highly credible and consistent on the points related to alleged
coercion.  There were no threats or promises or intimidating
behaviors, contrary to Mr. Pelle's assertions.  While he was not

---

[13] Indeed, Pelle admits he was the one to first raised his
voice, one hour after the questioning began.  (Tr. at 122:1-10.)

16

free to leave, he remained free to terminate the interview and to remain silent.

Additionally, there are inconsistencies in the defense witnesses' testimony which give this Court reason to doubt their credibility as well. For example, Delores Pelle testified that she arrived home at 5:00 P.M. on September 20th and was restrained outside the house by Matt Brodman, who remained with the three on the porch, blocking their entrance to the house. (Tr. at 110:16-18.) Brandon and Anna corroborated this testimony, saying that Brodman physically restrained Pelle's mother when she arrived. (Id. at 57:10-11.) Defendant, however, testified that Brodman was sitting with him in the living room at 5:00 P.M., and that he had been inside since 4:45 P.M. Indeed, Pelle initially testified that Brodman picked up the receiver at 5:00, just about the time Terregino testified she called Pelle's home. Brodman could not have been in both places at once.[14] The two versions of the events cannot be reconciled and, therefore, the Court has reason to be skeptical of the defense witnesses' credibility.

Moreover, the Court had the opportunity to observe the

---

[14] When questioned about these inconsistencies, Pelle changed his testimony, stating that Brodman actually "was going in and out of the house." (Tr. at 24:22-25:1.) Again, the Court finds Mr. Pelle's post hoc explanations of the events of September 20th unconvincing, especially considering the family members' testimony that Brodman was standing outside, blocking their entrance to the house.

demeanor of the witnesses and was troubled by the nearly identical recitations of selective facts by the defense witnesses.  (See pp. 7-9, supra, and note 9.)  Thus, for example, Ms. Terregino claims she listened to the interrogation on the open telephone line yet remembers only the threat to arrest Defendant's mother, Defendant's request to call his attorney and Lynch's statement which she quoted, "God damn it, something's going on here and I'm not leaving until I find out."  (Tr. 88:15-25.)  She recalled nothing else being said.

Those items – the threat to arrest Defendant's mother, the request to call counsel whose name was on the refrigerator, and the Lynch epithet – were the same three that were testified to by the other three witnesses allegedly listening outside the window. Each defense witness claimed at the hearing to recall nothing else of substance that was said by the investigators other than those statements, repeated almost verbatim, supporting Mr. Pelle's motion.  Significantly, no other witness claims to have heard a word of Mr. Pelle's inculpatory statements to the investigators during the two interrogations.  The selectivity and uniformity of the testimonies of Brandon Pelle, Anna Marie Pelle, Christina Terregino and Delores Pelle cause this Court to disbelieve the essential elements of their testimony at the hearing.

In short, having heard extended testimony at the suppression

18

hearing, and having listened closely to the relevant portions of Pelle's taped statement, the Court concludes that, viewing the totality of the circumstances, Pelle was at no time threatened, and his confession was given voluntarily as the "product of an essentially free and unconstrained choice by its maker."

    B.   <u>Fifth Amendment Rights</u>

Defendant also argues that he invoked his right to counsel several times from the time the officers arrived at his house, but that his requests were denied.  The Court finds in the first instance that Defendant never requested counsel.  In any event, for reasons explained below, the Court finds that Pelle's Fifth Amendment rights were not violated.

The Supreme Court in <u>Miranda v. Arizona</u>, 384 U.S. 436, 469-473 (1966), held that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins.[15]  If the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him.  <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-376, (1979).  If, however, a suspect requests counsel at any time

_____

[15] Here, the Government conceded at oral argument, and the Court agrees, that the setting of the September 20th questioning was custodial.  <u>See</u> <u>United States v. Scott</u>, 590 F.2d 531, 533 (3d Cir. 1979) ("[O]ne can be 'in custody' so as to require Miranda warnings even in one's own home.")

during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.  Edwards v. Arizona, 451 U.S. at 484-485.

As recounted more fully above, shortly after arriving at Pelle's home, Jewusiak read Defendant his Miranda rights and the officers presented him with a statement of rights form for his signature.  Defendant maintains that he initially refused, saying, "I don't want to sign anything right now.  I think you people should leave until I consult with my attorney."  (Id. at 129:6-8.)  The Court finds, to the contrary, that Mr. Pelle did not invoke his right to counsel.  Jewusiak and Lynch testified unequivocally that Pelle never asked to interrupt their questioning so that he could consult his attorney.  (Tr.A at 24:14-17; Tr.B at 35:18-19, 42:8-13.)  The Court credits this testimony, as both officers were present throughout the entire course of Pelle's interview, and both have given a believable account of the events of September 20th.

Even if the Court were to accept Defendant's assertion that he expressed a desire to speak with his lawyer at that time, the Court finds that such a request was not "a clear assertion of the right to counsel" as is required under the Fifth Amendment.

The assertion of the right to counsel must be made clearly and unambiguously.  Thus, for example, in Davis v. United States,

512 U.S. 452 (1994), the Supreme Court held that the defendant had not made "a clear assertion of the right to counsel" when he said, "I think I want a lawyer before I say anything else."  See also Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (finding no clear invocation of the right to counsel where defendant asked, "Could I see a lawyer?").  Similarly here, Defendant's statement that he thought he wanted to see a lawyer was ambiguous.  The Court does not expect the officers to have been able to "make [the] difficult judgment call[]" as to whether Pelle's statement constituted an unambiguous request for counsel. Davis, 512 U.S. at 461.  Accordingly, the Court finds that Pelle did not invoke his right to counsel under the Fifth Amendment prior to signing the waiver of rights form at 3:55 P.M.

Moreover, because Defendant waived his right to counsel at 3:55 P.M. after receiving the Miranda warnings, the law enforcement officers were free to question him, which they did until roughly 5:20 P.M., at which time Pelle claims that he again asked for an attorney.  For the following reasons, the Court finds that even had Pelle requested an attorney, he was not being interrogated within the meaning of Miranda when he voluntarily reinitiated the conversation at approximately 6:00 P.M.[16]

---

[16] As already explained, the Court credits the testimony of Jewusiak and Lynch who stated unequivocally that Pelle never asked to consult his attorney at any time during the interrogation.

As recounted above, the questioning ceased at approximately 5:20 P.M., and only resumed after Defendant himself reinitiated the conversation, about thirty minutes later.  Specifically, Pelle testified that after he adopted the "silence tactic," the officers stopped questioning, began gathering their things, and talked among themselves.  The only officer to talk to Pelle during that 25 minutes of silence was Franchini who, according to Defendant, was only "trying to make some small talk, complementing . . . how nice the house looked, along those lines, trying to make like small talk."  (Tr. at 8-13.)  Lynch, according to Pelle, declared the investigation concluded and began gathering his belongings.  Clearly, these statements did not amount to an interrogation, or the continuation of interrogation, after Pelle became silent.

To be sure, Pelle testified that Lynch had threatened to obtain warrants for the other family members.  In the first instance, in light of Pelle's characterization of the officers as "very cordial" and "very nice," and his statement that no threats had been made by the officers, as well as Lynch's testimony that he did not make such a threat, the Court does not believe Pelle's testimony.

In any event, even if such a threat were made the Court holds that the statement does not amount to an interrogation within the meaning of the Fifth Amendment.  In <u>Rhode Island v.</u>

Innis, the Court held that "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  446 U.S. 291, 300-01 (1980).  In other words, the Court there held, interrogation within the meaning of Miranda refers "to any words or actions on the part of the police (other than those normally attendant to an arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.  The focus is on the perceptions of the subject, not the intention of the police.  Moreover, there must be a causal connection between the threat and the confession.  United States v. Walton, 10 F.3d 1024, 1029 (3d Cir. 1993) ("The real issue is not whether a promise was made, but whether there was a causal connection between [the officer's] assurance and [the suspect's] statement.").

Defendant here concedes he was not being questioned when he reinitiated the conversation.  Therefore, the issue is whether the statement allegedly made by Lynch constituted the "functional equivalent" of express questioning.  The Court holds that it did not.  As mentioned above, in making such a determination, the proper focus is on the perceptions of the subject, not the intention of the police.

Here, Defendant testified that once the threat was allegedly made, he remained silent for the next thirty minutes, until

23

approximately 5:50 P.M. when he "abandon[ed] the tactic." (Tr.B
at 5:19-22.) Thus, from the perspective of Pelle, far from
eliciting incriminating statements, Lynch's alleged threats had
the opposite effect – they silenced him.[17] Therefore, when the
threat was allegedly reiterated roughly thirty minutes later, the
Court finds that it would not have caused Pelle to change his
"tactic." Indeed, Pelle testified that he reinitiated the
conversation not because of the threat, but "as a result of Mr.
Lynch's comment . . . that he was concluding the investigation."
(Id. at 6:21-25.) Lynch certainly did not act improperly by
concluding any further attempt at interrogation after Pelle had
been silent for some minutes.

The Court holds that Lynch's comments were not the
functional equivalent of express questioning and, thus, the Court
will also permit the Government to seek to introduce any
statements given by Pelle after he voluntarily reinitiated the
conversation at approximately 5:50 P.M.

---

[17] Moreover, it is entirely unlikely that Defendant would
have taken Lynch's threat seriously, if made, as he had no reason
to believe his mother or wife were implicated in any wrongdoing.

24

**III. CONCLUSION**

     For these reasons, the Court will deny the motion to suppress by Defendant.  A jury trial has been set for November 13, 2006.

     An appropriate Order will be entered.


**August 31, 2006**          **s/ Jerome B. Simandle**
Date                        JEROME B. SIMANDLE
                            U.S. District Court